Filed 10/2/25  P. v. Hackett CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B336651 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA045110) |
| v. | |
| SAMUEL LAFAYETT HACKETT, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Dorothy L. Shubin, Judge.  Affirmed.

Samuel Lafayett Hackett, in pro. per.; Patricia S. Lai, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

—————————————

Samuel Hackett appeals from an order denying his Penal Code section 1172.6 petition for resentencing.[1] His appellate counsel filed a brief under *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*). Hackett filed a supplemental brief arguing the trial court erred in denying his petition. We consider Hackett's contentions and affirm the trial court order.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Underlying Crime*

We take the following facts from the opinion affirming Hackett's convictions on direct appeal.[2] (*People v. Hackett* (Feb. 25, 2003, B154152, B159148 (*Hackett*) [nonpub. opn.].)

"In January 2001, 32-year-old Christopher Hollis lived with his mother, Laura, in Altadena. Hollis's son, Ketren Allen, had been living with them but he moved out in December 2000. Ketren and defendant Hackett were longtime friends, and Hackett had been a frequent visitor to the Hollis residence before Ketren moved out. Hackett occasionally spent the night and, when he did, he kept his things in a navy blue duffel bag.

---

[1] All further undesignated statutory references are to the Penal Code. Hackett's petition was filed pursuant to former section 1170.95. Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[2] We refer to the Court of Appeal opinion only "for background purposes and to provide context" for Hackett's arguments. (*People v. Flores* (2022) 76 Cal.App.5th 974, 978, fn. 2, disapproved of on another ground in *People v. Patton* (2025) 17 Cal.5th 549, 569 (*Patton*).) We do not rely on the facts in the opinion to review the trial court's determination of Hackett's eligibility for resentencing at the prima facie stage. (*Flores*, at p. 988.)

Sometime during fall 2000, Hollis borrowed this duffel bag and then refused to return it because Hackett had not returned something he had borrowed from Hollis (either an outfit of clothes or another duffel bag). Over the course of a few months, Hackett asked Ketren many times when Hollis was going to return the duffel bag.

"On January 2, 2001, [fn. omitted] Diana Ramirez was visiting with Hollis on the front porch of his house when Hackett drove up. Hackett walked up to the porch, carrying a lighted marijuana cigarette, and asked about his duffel bag. Hollis asked about his own duffel bag. When Hackett said he had returned Hollis's bag to Laura two weeks ago, Hollis called him a liar. Ramirez testified Hackett got 'pissed off' and 'had like a rage.' Hollis 'said he wasn't going to give [Hackett] his duffel bag because [Hackett] came up talking shit.' Hackett said in an angry, threatening manner that 'he would be back with his cousin,' and walked to his car while Hollis went into the house. Ramirez told Hollis she would give him $20 'if it [meant] that much, just to keep the peace.' She didn't want Hackett to 'leave angry,' and she 'was just worried about him coming back' with his cousin. Hackett left without taking the money. Ramirez later asked Hollis where his .45-caliber gun was (she was going to be leaving her young daughter at his house that day and she wanted to make sure the gun was inaccessible). Hollis showed her the gun-it was 'on top of the closet in the speaker [*sic*].'

"On January 4, the police stopped Hackett for traffic violations. Because Hackett did not have a driver's license, his Honda was impounded. The trunk of the Honda was stuffed with duffel bags and backpacks that were filled with clothing and towels. On the rear seat there was more clothing and some

household items, including an iron. Hackett would have had to pay about $280 to get his car out of the impound yard.

"On the morning of January 5, Laura left home to go to work. Hollis was asleep on a couch in the TV room. Although it was a sofa bed, Hollis slept on it unopened. Laura left by the back door, locking it behind her. The rest of the house was locked up. Nobody besides Hollis and herself had keys to the house.

"At 9:00 or 9:30 a.m. that same morning, Hackett visited his girlfriend, Cinnamon Scott, in Pasadena. Scott testified Hackett was wearing a 'white T-shirt, gray sweats, white Jordans [tennis shoes] and [a] gray beanie.' Asked if Hackett's sweat pants had pockets, Scott testified: 'His shirt covered them so I couldn't see them.' She denied having told police the sweat pants had pockets. Hackett told her his Honda had been impounded and he asked to borrow money so he could get it back, but Scott didn't have any money. Hackett left her apartment between 10:00 and 10:30 a.m.

"The jury heard a taped interview, recorded on January 9, in which Scott told police the sweat pants Hackett was wearing that morning had 'two pockets on the side, [and a] draw string pocket in the back.'

"Lawrence Duncan, who lived next to Hollis and Laura, testified that sometime between 10:30 a.m. and noon on January 5, he saw someone go through the Hollises' backyard gate. Duncan described the person as a man, 18-to-25 years old, medium build and height (under six feet), wearing a gray and white stocking cap or beanie, gray sweat pants with pockets, a white sweatshirt and black gloves. Duncan did not get a good look at the person's face. About 20 minutes later, a car pulled up in front of the Hollis residence and blew its horn two or three

4

times.  There were two people in the car.  The passenger got out and approached the front door.  A few minutes later the horn blew again, the passenger returned to the car and the car drove off.  The passenger was someone Duncan recognized and it was definitely not the person who had gone through the rear gate.

"Duncan did not see the man who had gone through the rear gate leave, but sometime in the afternoon he saw the same person again approach the Hollis residence and go toward the rear gate.  At the time, Duncan assumed this person was Ketren Allen because he had gone through the back and the '[p]eople that live there come in the back gate.  The people that come to visit, go to the front door.'  But when he saw Ketren the following day, Duncan realized he had been mistaken because Ketren was taller and had a very different walk.  'Ketren walked like he was carrying a sack of potatoes.  The individual I saw walking had a glide walk, kind of confident, arrogant walk.'  Duncan testified he was 100 percent sure Ketren was not the person he had seen.

"Laura returned home from work about 5:00 p.m. to find the back door ajar.  There was no sign of a forced entry.  Hollis's wallet was on the kitchen floor, its contents 'just scattered.'  A cabinet drawer in the kitchen that had been closed when Laura left was now open.  The cushions of the sofa bed where Hollis had been sleeping were 'pulled out.'  In Laura's bedroom, '[t]he bed, the mattress, box spring, all of that [was] thrown up against the . . . wall.  All the drawers . . . [of] the dressers [were] pulled and like dumped because they was empty.  [¶] All my clothing in my closet was pulled out.'  Clothing and bedding had also been pulled out of the hall closet and left in a heap that came up to Laura's knees.  Another bedroom and the living room had also been ransacked.  One of her black gloves, which she usually kept on

top of her bedroom armoire, was on the bathroom floor; the matching glove was on the bedroom floor. There was no sign of Hollis. Laura called Duncan and then the Sheriff's Department. Deputies responded and did a quick sweep of the house, but did not find Hollis's body. Laura spent the night at a friend's house.

"Hackett's older sister Samantha also lived in Altadena. Hackett went to her apartment on that same day, January 5, sometime between 11:00 and 11:30 a.m., and stayed for a couple of hours. Samantha testified Hackett did not have anything with him when he arrived, '[j]ust the clothes on his back.' She identified People's exhibit #12, a large Tasmanian devil doll, as the doll she gave Detective Mitchell Loman on January 9. She denied having told him that Hackett brought this doll and a blue duffel bag with him on January 5. However, Loman testified Samantha told him that when Hackett arrived at her apartment, he had a 'blue duffel bag containing a bunch of stuffed animals' and clothes, and he 'was carrying [separately] a big Tasmanian devil.' When he departed, Hackett took the duffel bag with him and left the Tasmanian devil doll with Samantha (apparently as a present for her son). Loman identified People's #12 as the doll Samantha had given him.

"On the morning of January 6, Laura went back home. As she was cleaning up the mess, she uncovered the top of Hollis's head sticking out from the things that had been piled up in the hall. She ran to Duncan's house and he called police, who arrived to find Hollis's dead body.

"Laura later determined that a number of items were missing from the house. 'First thing I missed was my stuffed animals because the bag I had it in had been slit and it was in the kitchen on the floor.' She normally kept these stuffed

animals in an armoire in her bedroom. These stuffed animals included teddy bears and a Tasmanian devil doll. Shown People's exhibit #12, Laura testified it was the same size, shape and style as her Tasmanian devil doll. Laura identified People's #13, a Victoria's Secret bag containing various toiletries, as having been taken from her house. She identified a set of bath towels and wash cloths monogrammed with her initials ('L.B.H.'), as having been taken from a cabinet underneath her bathroom sink. She identified some soap as having been taken from her bathtub. She identified People's #16, a jeans jacket and pants outfit, as similar to an outfit of Hollis's that was missing after he was killed. She identified People's #17-two plastic red roses-as having come from 'a vase that was in a little stuffed animal that my son had gave me for Valentine's day,' and that was kept 'in the plastic bag with the others.' Also missing from the house were $53 in 'rolled pennies, nickels and dimes' that Laura had saved up, and Hollis's 45-caliber handgun.

"Lillian Naud testified that at about 7:15 p.m. on January 6, two men assaulted her and stole her purse and her car, a 1994 Acura Legend. One of the men looked 'very similar' to Hackett. There was a $100 traveler's check in Naud's purse.

"Cinnamon Scott testified Hackett visited her on January 6, at 6:00 or 6:30 p.m. He arrived alone in a blue Ford Escort and stayed 15 or 30 minutes. Half an hour or an hour later, he returned to Scott's apartment in Naud's car. [Fn. omitted.] Later that night, Hackett and Scott went for a drive in the Acura. Scott testified there was a Victoria's Secret bag in the back seat. Hackett told Scott the bag was for her. There was also a bag of towels in the car. When Scott asked Hackett where he got the Acura, he told her, 'Don't worry about it.' They visited Hackett's

friends Ketren Allen, Broderick Allen (Ketren's cousin), and Tijuan Chapman. Ketren testified Hackett and Scott drove up in Naud's car. When Hackett gave Ketren a hug, Ketren felt a handgun in the small of Hackett's back.

"Later that same night, Pasadena Police Officers Rudy Lemos and William Broghamer saw Naud's Acura parked in front of Scott's residence. They saw Hackett approach the car. Because the officers knew Hackett did not have a driver's license, they stopped him, ran the license plate, and ascertained the car had been stolen. They arrested Hackett. After they put him into the patrol car, Hackett said: ' "Can you get my jacket and cell phone out of the back seat of my car." ' Lemos retrieved the jacket. Lemos testified People's #16—the jeans outfit that had been identified as similar to Hollis's—consisted of the jacket he took out of Naud's car and the pants Hackett was wearing at the time. Also inside Naud's car were Laura's monogrammed towels, her plastic roses and her bag of Victoria's Secret toiletries. During a booking search, police found Naud's traveler's check in Hackett's pocket. Hackett also had in his possession exactly $53 in currency.

"On January 15, Ketren discovered his voice mail had recorded a conversation between his cousin Broderick and Hackett. The tape was played for the jury. According to the transcript of the tape recording, Hackett told Broderick: '[N****r] tell me to my face, [n****r], on the phone, you think I did it? [N****r], I don't need you tellin' my baby's mama you think I did it . . . .'[3] When Broderick said, 'Well I don't care what you talking about, Sam, you in jail, so,' Hackett replied: '*** I could

---

[3]    Epithet redacted. (See *People v. Aguirre* (Aug. 28, 2025, S175660) ___ Cal.5th ___ [2025 Cal. LEXIS 5621, p. *20, fn. 11].)

have you killed, just like that, Broderick ***.  Okay, it's a done deal, you bitch.'

"The autopsy showed Hollis had been killed by a single .25-caliber gunshot wound to the forehead.  Laura's glove, the one that had been found lying on the bathroom floor, tested positive for gunshot residue.  A so-called 'canine scent identification lineup' was conducted during which a trained dog matched the smell of this glove to Hackett."

In 2001, Hackett was convicted by "jury trial, for first degree murder, petty theft, robbery, carjacking, burglary, receiving stolen property, and driving or taking a vehicle without the owner's consent, with firearm use and aged victim findings (Pen. Code, §§ 187, 484, 211, 215, 459, 496, [former]12022.5, 12022.53, 667.9; Veh. Code, § 10851)." (*Hackett*, *supra*, B154152, B159148.)

With respect to the crimes involving Hollis, the jury found true that Hackett committed first degree murder under section 187, subdivision (a).  It also found true that in the commission of the murder, Hackett personally and intentionally discharged a firearm, a handgun, within the meaning of section 12022.53, subdivision (d), and personally used a firearm, a handgun, within the meaning of sections 12022.53, subdivision (b) and former 12022.5, subdivision (a).  The jury found not true the special circumstance allegation that the murder was committed while Hackett was engaged in the commission of a crime, robbery, within the meaning of section 190.2, subdivision (a)(17).  It also found Hackett not guilty of robbery but guilty of the lesser included offense of petty theft.

Hackett was sentenced to an aggregate state prison term of "61 years, 4 months to life." (*Hackett, supra,* B154152, B159148.) In 2003, a panel of this court affirmed Hackett's convictions on direct appeal and denied his accompanying habeas petition. (*Hackett, supra,* B154152, B159148.)

***Resentencing***

In 2022, Hackett filed a form petition for resentencing under former section 1170.95. The People opposed the petition, arguing that Hackett was convicted of first degree murder, with the jury finding true the allegations that in the commission of the murder, he personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (d) and personally used a firearm within the meaning of section 12022.53, subdivision (b). The People further asserted that the jury was not instructed on the natural and probable consequences doctrine, but was instructed on first degree felony murder and willful, deliberate, and premediated murder. The People contended that the only theory presented to the jury was that Hackett was the actual killer who either killed the victim willfully, deliberately, and with premeditation, or killed the victim in the commission of a robbery.

In support of their opposition, the People submitted a copy of the jury instructions from Hackett's trial. As relevant here, the jury was instructed on murder (CALJIC No. 8.10); willful, deliberate, and premeditated murder (CALJIC No. 8.20);[4] first degree felony murder based on the crime of robbery (CALJIC

---

[4] CALJIC No. 8.20 stated in relevant part: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree."

10

No. 8.21);[5] and aiding and abetting (CALJIC Nos. 3.00 [defining principals] and 3.01 [defining aiding and abetting]).  The jurors were also instructed that if they found the defendant guilty of murder in the first degree, they needed to determine if the special circumstance was true that the murder was committed while the defendant was engaged in the commission of a robbery (CALJIC No. 8.80.1).[6]

The People also attached the Court of Appeal opinion on direct appeal, verdict forms from Hackett's trial, excerpts of the reporter's transcript from Hackett's trial, including the closing arguments, and the information.  The trial court appointed defense counsel.  Through defense counsel, Hackett filed a brief in support of his original petition.  Hackett contended he had established a prima facie showing of eligibility for resentencing because the jury was instructed on felony murder and on aiding and abetting, with an instruction that each principal is equally guilty, and the jury's findings did not establish he was convicted as the actual killer.

In 2024, the trial court heard argument from counsel and denied the petition at the prima facie stage.  The court indicated

[5]     CALJIC No. 8.21 stated in relevant part: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime."

[6]     CALJIC No. 8.80.1 stated in relevant part: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if the following special circumstance is true or not true: [¶] The murder was committed while the defendant was engaged in the commission of a robbery."

11

it had reviewed the People's response to the petition for resentencing and its attachments, and the defense brief in support of Hackett's original petition. The court determined that Hackett was prosecuted as the actual killer and that the jury found Hackett to be the actual killer. The court therefore found Hackett ineligible for relief.

Hackett timely appealed. His court-appointed appellate counsel filed an opening brief that raised no issues and asked this court to independently review the record under *Delgadillo, supra*, 14 Cal.5th 216. We directed appellate counsel to send Hackett the record and a copy of the opening brief. We additionally advised that within 30 days of the date of the notice, Hackett could submit a supplemental brief or letter stating any grounds for an appeal, contentions, or arguments he wished this court to consider. Hackett timely submitted a supplemental brief, with several exhibits.[7]

## DISCUSSION

## I. Senate Bill No. 1437 and Section 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) (Stats. 2018, ch. 1015) eliminated the natural and

---

[7] Hackett subsequently filed a "supplemental declaration," which, among other things, stated he had timely filed his supplemental brief, a request for judicial notice of his supplemental brief, and a "request for relief from default/motion to accept late filing." However, this court had already deemed Hackett's supplemental brief timely. Hackett's motions regarding a late filing are moot. Hackett's "supplemental declaration" also raises arguments regarding evidentiary and other issues at his original trial and with his appointed counsel in his section 1172.6 proceeding, which we address later in this opinion.

probable consequences doctrine as a basis for finding a defendant guilty of murder and limited the scope of the felony murder rule. (*People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

The bill amended section 188, requiring that to be convicted of murder, "a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (*Id.*, subd. (a)(3).) The bill also amended section 189, subdivision (e), so that a person may now be convicted of felony murder only if he or she (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, aided and abetted the actual killer in committing first degree murder; or (3) "was a major participant in the underlying felony and acted with reckless indifference to human life."

Senate Bill No. 1437 also created "a procedural mechanism for those previously convicted of murder under a theory amended in [Senate Bill No. 1437] to petition for resentencing."  (*People v. Emanuel* (2025) 17 Cal.5th 867, 880; *Lewis*, *supra*, 11 Cal.5th at p. 959.)  "The process begins with the filing of a petition that declares, among other things, that '[t]he petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill No. 1437.  (§ 1172.6, subd. (a)(3); see *id.*, subd. (b)(1)(A).)"  (*Emanuel*, at p. 880.)  Senate Bill No. 775 (2021–2022 Reg. Sess.) subsequently extended resentencing relief to any person convicted of murder based on any "other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . ."  (§ 1172.6, subd. (a).)

These amendments to the Penal Code did not invalidate murder convictions based on the theory that the defendant intended to kill or was the actual killer. (Stats. 2018, ch. 1015, § 1, subd. (f); *Strong, supra*, 13 Cal.5th at p. 707; *People v. Mares* (2024) 99 Cal.App.5th 1158, 1166.)

## II. The Record of Conviction Established Hackett is Ineligible for Relief as a Matter of Law

Here, the record of conviction establishes that Hackett was not convicted of murder on a now invalid theory. (*Lewis, supra*, 11 Cal.5th at pp. 971–972 [trial court may look at the record of conviction at prima facie stage].) Indeed, the record of conviction demonstrates that Hackett was convicted as the direct perpetrator: the actual killer. Whether convicted under a theory of premeditation and deliberation or felony murder, Hackett was convicted on a still valid theory. (*People v. Harden* (2022) 81 Cal.App.5th 45, 53 ["defendants convicted of felony murder are not eligible for relief if they were the actual killer"].)

The information charged only Hackett with murder. The People's theory at trial was that Hackett was the sole perpetrator of the murder and the actual killer of Hollis. (*People v. Hurtado* (2023) 89 Cal.App.5th 887, 893 [petitioner ineligible for relief where he alone attempted to commit murder].) Accordingly, the People alleged that as to the murder count, Hackett personally used and discharged a firearm in the commission of the murder. The jury found these allegations true. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 744 [only use of handgun was by one robber and no evidence anyone else was present].) Hackett's petition for resentencing did not identify anyone else as the direct perpetrator of the murder or anyone else involved in any manner in the murder. As our high court has explained in the plea

14

context, "absent specific facts, no such [material fact] dispute arises . . . from mere latent, speculative possibilities; that is, a hypothetical alternate direct perpetrator cannot be conjured from thin air or a legal conclusion." (*Patton*, *supra*, 17 Cal.5th at p. 567.)

On appeal, Hackett argues that because the jury rejected the special circumstance allegation that the homicide occurred during the commission of a robbery, "the jury did not conclude that [he] was the actual killer or acted with reckless indifference to human life." However, that the jury found not true the allegation that the murder was committed while Hackett was engaged in the commission of a robbery does not indicate it also found he was not the actual killer. The elements of the special circumstance were distinct from any determination of whether Hackett was the direct perpetrator of the murder.[8]

The authorities Hackett relies upon to support his arguments are inapposite. In *People v. Clayton* (2021) 66 Cal.App.5th 145, the crime involved four perpetrators engaged in a robbery and murder. The defendant claimed he had no part in the killing. In *Strong*, *supra*, 13 Cal.5th 698, the defendant and an accomplice attempted to rob a drug dealer. The accomplice shot and killed two victims. In *People v. Bascomb* (2020) 55 Cal.App.5th 1077, the defendant and another man committed a

---

[8] The trial court instructed the jury with CALJIC No. 8.81.17: "To find that the special circumstance, referred to in these instructions as murder in the commission of robbery is true, it must be proved: [¶] 1. The murder was committed while the defendant was engaged in the commission of a robbery; and [¶] 2. The murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection."

15

robbery, during which the other man shot and killed the victim. In contrast, the murder case against Hackett did not involve accomplices. The reasoning of *Clayton*, *Strong*, and *Bascomb* regarding felony murder, or the felony murder special circumstance allegation, is of no assistance to Hackett. Because Hackett was prosecuted and convicted as the actual killer, there was no need for the trial court to consider whether the jury did or did not find he was a major participant in the crime, acting with reckless indifference to human life.

In sum, because Hackett was convicted as the actual killer, he has no basis to argue he was convicted under a theory in which the jury imputed malice to him.

## III.    Hackett's Other Assertions of Error

Hackett raises several other claims of error unrelated to his eligibility for relief under section 1172.6.

Hackett argues that the trial court's denial of his petition without an evidentiary hearing violated his equal protection and due process rights. We disagree. A petitioner is entitled to an evidentiary hearing only if undisputed facts contained in the record of conviction do not demonstrate the petitioner's ineligibility for relief as a matter of law. (§ 1172.6, subd. (c); see *Lewis*, *supra*, 11 Cal.5th at pp. 971–972.) As explained, we find no error in the trial court's conclusion that Hackett failed to make the requisite prima facie showing of eligibility for resentencing. We therefore reject his due process and equal protection arguments.

Hackett also contends that his constitutional rights were violated when the trial court did not allow him to speak at the

16

prima facie hearing.[9]  However, Hackett was represented by counsel at the hearing and, as the court explained to Hackett, it could not take additional evidence at that juncture.  Rather, testimony is appropriate at the evidentiary hearing stage. (§ 1172.6, subd. (d)(3) [the "petitioner may also offer new or additional evidence" at the evidentiary hearing]; *People v. Bratton* (2023) 95 Cal.App.5th 1100, 1128 (*Bratton*) [no new evidence, including defendant's testimony, at prima face stage].)

Hackett additionally asserts several arguments related to his trial counsel's alleged inadequate performance in connection with the resentencing proceedings, the trial court's failure to address his concerns, and problems with the video feed and audio at the resentencing proceeding, which Hackett attended remotely.  To the extent these claims are not forfeited by the failure to support them with reasoned argument and citations to the record or relevant authority (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075), they fail to provide a basis for reversal.  Not only is there " 'no constitutional right to the effective assistance of counsel' in state postconviction proceedings" (*Delgadillo*, *supra*, 14 Cal.5th at p. 226), Hackett also cannot show prejudice from any deficient performance of counsel or conduct of the hearing.  The record of conviction alone

---

[9]      At the conclusion of the hearing, after the court had made its ruling, the court and Hackett had the following exchange:
Hackett: "Your Honor, may I have a word?"
The Court: "No, sir.  It's not a hearing where the court takes any further evidence.  You could speak with your attorney after the hearing."
       After a pause in the proceedings, the court and counsel discussed and set a date for a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261.

demonstrates Hackett is ineligible for section 1172.6 relief as a matter of law. Hackett has identified no purported error of counsel or irregularity in the proceedings that would permit us to conclude anything other than that any purported error or irregularity in the proceedings was harmless, under any standard. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Chavez* (1980) 26 Cal.3d 334, 342, fn. 2, 350, fn. 5.)

Hackett also raises various claims of error relating to the evidence underlying his conviction, and he alleges that the prosecution withheld exculpatory evidence. These claims are not cognizable on a section 1172.6 petition. (See *Strong, supra,* 13 Cal.5th at p. 713 [resentencing proceedings involve "prospective relief from a murder conviction that was presumptively valid at the time," not the correction of "errors in past factfinding"]; *Bratton, supra,* 95 Cal.App.5th at p. 1127 [§ 1172.6 does not allow a " ' "do-over" ' " on previous factual disputes].) Finally, Hackett asserts that his youth and mitigating circumstances weigh in favor of resentencing. This is not an independent basis for resentencing relief pursuant to section 1172.6.

The trial court properly denied Hackett's section 1172.6 petition.

## DISPOSITION

The trial court order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:


EDMON, P. J.


HANASONO, J.